We'll get an argument this morning in Case 14-275, Horne v. Department of Agriculture. Mr. McConnell? Mr. Chief Justice, and may it please the Court, thank you for being willing to hear this little case a second time. It does involve some important principles and the livelihoods of Marvin and Laura Horne, and more indirectly, hundreds of small California raisin growers will be profoundly affected. This is an administrative enforcement proceeding that was brought by the Department of Agriculture against my clients, commanding the relinquishment of funds connected to specific pieces of property, namely reserve tonnage raisins. My clients appear in their capacity as handlers, but in the particular facts of this case, the economic circumstances are somewhat different than are ordinarily true. In this industry, because as handlers, the Hornes actually assumed the full financial responsibility for the raisins that were not turned over to the Department of Agriculture. The producers in this case were fully paid for their raisins. This is a factual finding to be found in the judicial officer's opinion at 66A of the appendix to the petition. The Hornes paid the producers for their raisins. According to the judicial officer, those raisins became part of the inventory of the Hornes. The raisin administrative committee, which I'll refer to as the RAC, came after the raisins. It was the Hornes and the Hornes only who bore the economic burden of this taking. Ginsburg. I thought the growers were paid only for the volume that they were permitted, that was permitted, the permitted volume, and that they were not paid for what goes in the reserve pool. Justice Ginsburg, that is true in the ordinary course. That was not true in this particular case because of the unusual business model of my clients. These producers were paid for all of their raisins. Are you objecting to the volume limitation, or is it just that the reserve pool that you find? We believe that a volume limitation would be a use restriction. It might possibly be challengeable under the Penn Central test, but it would not be a per se taking. In this case, because the government, the RAC, which is an agent of the Department of Agriculture, actually takes possession, ownership of the raisins, it is that aspect of the case which we're challenging. But that's what's so puzzling, because if you're not challenging the volume limit itself, you can't sell more than 60 percent of your crop. That's correct. And what happens to the rest of it? You're not going to be able to feed your family on the rest, the 40 percent. In the ordinary case, the reserve percentage, which in one case was 37 percent and was 30 percent, and in the other case, 47 percent, is handed over to the Raisin Administrative Committee. But if it wasn't, if we just had a volume, you cannot sell more than X amount. Then I take it that the grower would get nothing, nothing at all. At least with this reserve pool, there is the possibility of getting some money. Well, it all depends. The way volume controls generally work is that the owner of the produce is permitted they have to hold back a certain amount in a reserve, and then they're permitted to sell that reserve as the market conditions continue. In this case, of course, the RAC sold the raisins. In some cases, even above the field price, there was a market for the raisins. So I would assume that volume controls under these economic conditions might have left the these particular people better off than under the current circumstances. So what you're complaining about is the administrative expenses? I still don't understand why this makes this a Penn Central case as opposed to a per se taking. You've given up on this being a Penn Central case. We have never claimed that it was a Penn Central case. And so basically, you see a nexus between the regulation and its purpose. We do, but more fundamentally, this is an actual transfer of the raisins themselves to the government. This is the government. How is this different than Leonard? Well, Leonard involved oyster shells, which are owned by the State. They're wild animals. They're the property of the State. And the oystermen had no property interest in them other than what the State chose to license them to harvest. Gosh, is that really true, Mr. McConnell? I mean, when these fishermen took the oysters, the oysters, you know, including the shells from the bay or other waters, you know, they could then sell the oysters. Why weren't the oyster shells theirs at that point? They have whatever property interest the State of Maryland provided for them, and withheld the 10 percent of the oyster shells for the purpose of essentially fertilizing the oyster. I mean, I guess I would have thought that as soon as they bring the oysters out of the bay and they haul their catch to shore, that what they've hauled to shore is then theirs. Except for the 10 percent that the State reserved, yes. Well, so I guess what Justice Sotomayor's question is, is why wouldn't the same be true as to raisins? Because raisins are not wild animals, even if they're dancing, and they did not originally belong to the Federal Government. So you think that Leonard is an animals case as opposed to a, you know, the State can tax your property case? Yes, I do. That's not how it was defined by the Court. They called it a tax. They did also call it a tax, and I'm perfectly happy to address whether this is a tax, because under this Court's standards for criteria for determining a tax, this certainly is not one. Referring to the criteria in the NFIB case, this is not in the Internal Revenue Code. It's not collected by the Internal Revenue Service. It's not author of the tax. There's no tax authorized by Congress. The proceeds of the tax do not go into the General Treasury. This is not a tax. But it didn't happen that way in Leonard either. What the Court was basically saying is the government could do this because this is a good in commerce. As long as it could meet the Penn Central test that there is some nexus between the government's goal and the regulation, then it's okay. Now, there they used it to fertilize oyster ponds or to refertilize the oysters. Here they're doing it to maintain prices and giving you whatever is left over on the reserve. The fact of the matter is that the oysters belong to the State of Maryland, and when the State of Maryland decides to allow fishermen to harvest the oysters Could you tell me where in Leonard that was discussed? I'd be very happy to file a supplemental brief with the Maryland citations indicating that the oysters belong to the State of Maryland. I thought that what the Constitution required for taking was just compensation, not a reasonable nexus to a good policy. Am I wrong about that? You are not wrong about that. I don't think so. I suppose that question, underlying the government's briefs, and we can ask them what its position is, or you can characterize their position if you choose, is the thing, since we could do this other ways, what difference does it make? Do you understand that to be an underlying premise in their argument, or is that unfair on my part? Well, they certainly say that from time to time, and this Court two years ago in Kuntz rejected arguments of that sort. But, in fact, there is a fundamental difference between a volume control, which is present for a number of agricultural products, versus the taking. Because in this case, the government literally takes possession of the raisins. It can use the raisins as collateral to get a loan. It can give the raisins away. It can sell the raisins. If that is your position, why didn't you ask this? You are attacking this reserve arrangement and the possession, the government's possession of the raisins themselves. And you, as far as I have heard so far, you are not attacking volume limit. You cannot market more than X amount. Why didn't you then ask the Department of Agriculture for an exemption from the reserve pool, instead of, you see, what you are trying to do now is to get rid of the volume limit as well. In this particular program, there is no separate volume control in the sense that there is no regulation that tells either producers or handlers how to use or sell raisins. Instead, they are told to set aside the raisins and give them to the government. So here there is a taking, and the part that isn't given to the government. Suppose we just — couldn't you have asked to excise that part of it and still leave the limit on the amount that could be marketed? I mean, does it — we have a division between what goes in the reserve and what can be marketed. Well, Justice Ginsburg, the way this case arose is that the Department of Agriculture came after my clients. We did not. This is not our lawsuit. The department came after our clients. Is it counterclaim? It's a defense. It's a defense. The department says give us either raisins or their monetary equivalent, and we say that's not constitutional. If there was a taking, would there be any obligation on your part to propose an alternative to the taking? The government comes and takes your property. Can't you just resist the taking without saying, oh, government, you can do this in another way. Please do it in a different way. You don't have to do that, do you? We do not, and I'm not sure that any alternative ways would even be permitted under the regulations. So, sir, my question is, it goes on from this. I mean, maybe the answer is, well, just don't decide that. But, look, I assume with you for the moment, for argument's sake, I have some raisins in my basement. I'm in this program. The government comes with a shovel and some burlap sacks. It takes the raisins. I would say, well, sounds like a taking to me. At the next point, the Constitution doesn't forbid takings. It says what you have to do is pay just compensation. Now, it's at that point I want to know what happens, because I guess the government could argue, look at this program. It's a big program. This program, what it does is it gives raisin farmers, at the public's expense, more money. So if, in fact, you don't want us to take your raisins, all right, fine, but there would be no program if everybody said that. So we have a rule against free riders. Now, we'll give you what it costs you to take your raisins. What it costs you is, in fact, the difference between what you receive given the program and what you would receive without the program. That difference works in your favor. It gives you money. It doesn't take money. So there is no compensation, too. In fact, if we were to have compensation, you should pay us, the government. So how are you going to get by that part? And if you can't get by that part, how are you going to avoid paying the fine? See, I don't see the relation between the taking argument, which is maybe all we have to decide, and how eventually you either get some money or you don't have to pay the fine. If you have a minute, I'd appreciate just the explanation. I would love to. The — there's both a conceptual and a practical response. Let me give the practical response first, which is that my clients are certainly not better off. By the Secretary's own calculation, the price of raisins was $63 per ton higher with the volume controls than it would have been in an unregulated market. The field price that year was $810 per ton. Taking away 30 percent of their raisins does not end up with the — with my clients better off as a result of the program. Quite the contrary. They lose money. We have the calculation in our library. Kennedy, I don't want to interrupt you because you're going to get to the theoretical argument, but isn't the response that, well, the price that you just quoted is because of this program? And it's circular, or am I wrong? No, no. By the Secretary's own calculations, $63 of that $810 is attributable to the volume controls in the program. Only $63. Except weren't we told that the demand for raisins is inelastic? So if you glut the market, you're going to have what happened before the RCA. Well, it's — You're going to have prices dropping. It is — That's the purpose of free competition, isn't it? Actually, under today's conditions, the elasticity is not as enormous as it would need to be for this to be a profitable program. Well, that's today, but you haven't paid a reserve in years now. Well, we're talking — when I say today, what I mean is the two years that are — To one of your arguments could be — I get your argument. Now, the conceptual point is that this is a per se taking, and it's — if there were benefits, such as I don't believe that there were, if there were, that would at most go to whether there was implicit in-kind compensation for the taking, which would go to the question of compensation. Implicit in-kind compensation is a complicated matter. It has to do with whether there were special benefits, that there's a split all over this — all over the country on that. I don't think we want to get into whether this would be a special benefit in this case. Okay. So what we should say in your view, do you have any objection to my writing if I were to write it like this? Taking. Yeah. It's a taking. Okay. But the Constitution forbids takings without compensation. The object of the program is at least in general to give farmers more compensation than they would have without it. Programs can work badly, sometimes are counterproductive, but if this is working well, that's what happens. So we send it back to the Court to see, did the program work well? Did it work to actually make your client better off? What rules do we follow? That's how we should do this, in your opinion. I think not. Now, if I — but I'm close to there. If this were an eminent domain proceeding, then the lower court would determine whether there was implicit in-kind contribution. If it were an inverse compensation proceeding, possibly the same. But this is actually an enforcement action. It is specifically guided by the regulations in the 7 CFR. And under those regulations, we know exactly what takes place. And implicit in-kind contribution is not provided for in those regulations. What is provided in those regulations is that the — if reserve pool raisins are not handed over to the RAC, the handler must pay — multiply the number of raisins by the field price, and that is it. Now, that is also the measure of the value of the raisins, so that if they take that, the compensation is exactly that, and the two things simply are awash. Because the regulation — and I think the broader principle here is that this is actually not a program which is designed to provide compensation. The government almost concedes this. This is not — this is not like getting land for a post office where the government intends to pay. This is more like a program like — like a Kaiser Aetna or some of the others where, if it is a taking, the government has no intention of paying a compensation. That's not the kind of program it is. And in cases — may I just — in cases where there's a — there's a taking and the program does not contemplate compensation, the standard judicial remedy for that is to — is to forbid the taking. It is not — So I just want to get back, Mr. McConnell, to the — whether it is a taking point. And I I've just been trying to think about whether your argument would apply to other kinds of programs and how it might apply to other kinds of programs. So how about just programs where the government says give us — produce records for us? I'm sure that there are a lot of programs like that in the world. And there is something intuitive about your saying, well, the government is asking us to turn over stuff. And I'm wondering — it seems to me that the government asks people to turn over stuff all the time in the form of records. How would that fare under your argument? If the — if the records — if what the government is asking for is information, this is not going to be a taking. If the records are themselves of historical value, as they were in Nixon v. General Services Administration, and they want to put them in the museum, then they have to pay for them. I don't know if they're historical value. They're just physical objects in the same way that raisins are physical objects. And the government wants some records. The government does not take permanent possession of records. If I'm, say, in an IRS audit and they ask me to show records to establish my tax deductions, I show them the records, they see the information, it is not a taking. No, but — so you're saying that the government couldn't ask you to deliver records to them. I did not say that. They can ask me to do that, and it is not a taking unless they've taken a sort of permanent possessory interest. If they go off and sell the records the way they sell the raisins, then I — They're just keeping the records. If they're keeping the records forever, I'm not sure, but I doubt very much that that would be a taking. I just don't understand — Again, if the value of the records is the information, which is what I assume it is in a regulatory program, we're not talking about actual physical — Well, there are cases on custodia legis. The government all the time, in criminal cases, takes control of valuable objects for evidence, and sometimes it keeps it forever and ever. And in those cases, I think there is a taking. If it's too long, I think we said that, or I think other courts have said that. In other words, the government can keep it only so long as is reasonably necessary for the case. You have a valuable diamond ring, which is evidence, and the government keeps it. But it keeps it only for so long as it is necessary. I think that there are complicated sets of rules having to do with contraband and having to do with property that is used as an instrumentality of a crime and so forth. But this is extremely far afield from raisins, which are a — which are a valuable piece of property. If the government — But I'm trying to understand why it's — It makes itself. Because I'm trying to understand why it's far afield and what it's far afield from. I mean, you even said, well, information is no problem, but people have property interests in information all the time. And if the government says, you have to give us that information, which counts as property, why is that not subject to your rule? Information can be property when it's intellectual property. For example, trade secrets can be property. I don't think ordinary records such as the IRS demands from taxpayers is a taking. Sotomayor, you mentioned the Santo case where we said the turning over of trade secrets, which is property, we've just admitted that, for the privilege of selling other commodities, the pesticides was okay, wasn't a taking. How do you deal with that case? The — there's broad language in that case, which this Court cut back upon in Nolan v. California Coastal Commission. In Nolan, the Court held that Monsanto could not stand for the proposition that it is an affirmative benefit to someone simply to allow them to use their property in an ordinary sense. There has to be an actual affirmative government grant of a benefit for the condition of argument of work. Sotomayor, getting $63 more a pound for what you sell seems like a significant benefit. They are not given — the $63 results from volume controls. That does not require a taking. The taking itself is of absolutely no value to the producers or anyone else other than those who receive the export subsidies from the sale of the raisins. They are the only ones who benefit from the actual taking. But you couldn't do it. You would have a product that would be valueless, except for that which you could eat at home. But you didn't intend to eat it at home because you gave it up for sale. If they — if they gave you the raisins, would you be able to export them and get the government subsidy? If they — my clients are not actually in the export business. If the — if my clients were selling raisins for export, they would be entitled to receive the export subsidy, but that's not the business that they're in. My point is just you couldn't otherwise sell this commodity. If all they did was put it in the House and say to the producers, sell 60 percent this year, what would you do with the raisins? Well, the way — They'd just sit there. The way other programs of volume controls work is that there's an initial reserve, and then as market conditions develop and more information is available, the owners of the product are permitted to release more and more into the market. And in these particular — But suppose the market goes the other way. Well, that would be a different — that would certainly be a different case. And if it went completely the other way, it could well be that the — that the owners of the raisins receive no money at all. But it's still — it's still a restriction on their use. The raisins haven't been taken from them. In this case, the raisins are actually taken from them, and the government sells them. In fact, in one of these years, the government was able to sell the raisins for more than the field price because of them. So there's a curlicue on this. You've helped a lot in my thinking. But there's still what we do about this fine. And the reason that I'm — it's maybe just a curlicue on the case. But the way I'm thinking of it, imaginary plan, I don't think I'll ask it. I'll figure it out myself. I want you to reserve it. Thank you. If there are no further questions, I'll reserve the remainder of my time for rebuttal. Thank you, counsel. Mr. Kneedler. Mr. Chief Justice, and may it please the Court. Petitioners isolate just one feature of a comprehensive program regulating the commercial marketing of a fungible agricultural product, a regulatory program that was established with producer approval and is established for their benefit. It is a cooperative program among the secretary, producers, and handlers. The raisins are not put into the program for the benefit of the government. They are put into the program for the benefit of producers, and they enter the stream of commerce. In fact, a producer is affected by this program. These plaintiffs are ingrates, right? You're really helping them. That's for their benefit. And they wanted this, didn't they? These Petitioners do not want the program, but the program was established on the premise that it is for the benefit of producers. I'm just saying it's one little feature of an overall program. That little feature happens to be the taking of raisins. I mean, you can have a lot of features. There's no objection to having many features. But where one of them is a taking, you have to justify it by just compensation. The question is whether it is a taking, and we believe it is not. You used to say it's not a taking if it involves just personal property, only real estate. Are you still? The government has abandoned that position. That has not been our position. We have not argued that personal property is not subject to the just compensation clause, such that if the government came in and took someone's car or someone's raisins. Well, the government has not taken the raisins. Let me just, if I could set this up and explain how it operates, this program operates only when the producer, the grower, has voluntarily submitted, committed the raisins to the stream of commerce. They have been put in, they have been put into the stream of commerce. They are turned over to the handler. The marketing order regulates only the conduct of handlers. The government can prevent you from putting something into the stream of commerce? Can charge you for putting something into the stream? I think the government can attach reasonable conditions on entering the stream of commerce. Including taking. Including taking. That, I think, is the lesson of Monsanto, which I think. It's an unconstitutional condition, isn't it? Taking without just compensation would be an unconstitutional condition for putting something into the stream of, stream of commerce. But it, it, that analysis would apply if there was a taking on the, on the Nolan Dolan analogy, for example. If what would be. Is there any, is there any limit to that argument? There's some examples in the briefs that are pretty startling. Could the government say to a manufacturer of cell phones, you can sell cell phones. However, every fifth one you have to give to us. We're a manufacturer of cars. You can sell cars in the United States. But every third car you have to give to the, to the United States. I think that would present a very different question. Why would it be, why would it be different? Because this is, this is part of a comprehensive regulatory program that, that it isn't just acquiring it. Well, sure. So you say if the government took all GM's cars, then it would be okay. No. But just not a third. No, no. We are not saying that at all. And if I, if I could just. Well, but just before you do. I mean, the, the rationale, I mean, the government can come up with a rationale to justify those examples really easily. You say cell phone providers benefit greatly if there's a broader cell phone market, if more people are using them. So we're going to take every fifth one and give it to people who might otherwise not be able to afford a cell phone. And that will help cell phone manufacturers because more and more people will have them, more and more people will want them. Therefore, it's okay. That's the same rationale you're applying here. This is for the good of the people whose property we're taking. Well, it, the, these programs go back to the 1930s when the agricultural industry in this country was in serious trouble. And particularly in California, prices were below costs of, of production. And you can do what you've done in most other marketing orders, which is not take their raisins. Instead say, look, you can only plant, you know, 63 percent of your acreage this year, or you can only produce, you know, 28 tons. That's how most of them work. And most of them thereby are, I presume, analyzed under Penn Central. This is different. This is different because you come up with the truck and you get the shovels and you take their raisins, probably in the dark of night. No. That, that is not what, that is not what the government does. The, the, the way, the way the order operates is that the producer submits the raisins to the handler. The handler then divides them into two categories. The handler is required by the order to maintain and separate the reserve raisins, but they are separated for later sale. They are, they, they don't go to the government. They don't, they are separated for later sale. The proceeds are pooled. Scalia. What do you mean they don't go to the, does not the government own them? Do, do you deny that the government owns them? Kneedler. For, for these purposes, for purposes of this case, we concede that the government gets legal title. But that doesn't mean, that doesn't mean that the government has the entire interest in the, in the raisins. They, the government has legal title so that it may, we will assume for purposes of this case, so that, that they, the government can, or the, the committee, it's not the Secretary of Agriculture, the committee can then sell the raisins. The proceeds of those sales are pooled and distributed back to the producers. Scalia. How many, how many, how much from those sales did, did these Petitioners acquire in the two years at issue here? Kneedler. Well, in. Scalia. How much? How much money was given back to them? Kneedler. In, in one year there was $272 per ton. In the other year there was, there were no proceeds back because. Scalia. Zero.  Because the cost of administering the reserve program exceeded, there was no net proceeds afterwards. Over the history of the program, it starts in 1949, right? Kneedler. Yes. Ginsburg. And so in how many years, while the program was in effect, was there a distribution to the, to the growers? Kneedler. I, I do not know that, how many years, but a great number of years. And, in fact, the, the three years leading up to the, to this particular time, one of the years here was $47 million was returned. In the prior years it was 50-some million and, and another 30-some million. So the experience has been that there typically has been some return. Sotomayor. Mr. Kneedler, I, too, am troubled, like Justice Alito, about his every fifth telephone or whatever, every fifth car or every fifth telephone you have to give to the government. You, I don't know you've answered that question. Is that a taking or isn't it? And, and what's the basis to distinguish it from? Because this is a comprehensive governmental program and, and it, it, it governs quality, it governs timing of sales, and it's important to recognize that's all that is going on here. The reserve raisins are set aside by the handler. After the producer has voluntarily turned them over, they're set aside by the handler for later sale. Petitioners concede in their brief at page 23 that the government can regulate the when, the manner, and the channel of sales. That's exactly what the reserve program does. They're turned over to the handler, the handler sets them aside in reserve. The committee then decides when and where to sell them. This, this is a, a historical quirk that you have to defend. You could achieve your, the government's objectives just as you do in most other cases through volume limitations that don't require a physical taking. For whatever reason in the history of the New Deal, this one was set up differently. And so we're here dealing with a classical physical taking. We are not going to jeopardize the marketing, the Agriculture Department's marketing order regime. And by the way, it better be the Department of Agriculture that takes these. You said earlier it's the Raisin Committee, or else you're going to have a lot of trouble in your government speech cases, where you always make the point that these committees are, in fact, the government. We're not, we're not saying the committee is not the government. What I was saying is that the, that the operation of the program is not for the government's benefit, it is for the producers' benefit. Correct. Correct. It was adopted by producers. This is, I'm having trouble with the same thing. I agree so far with what the Chief Justice said. Go back to the New Deal. You can, in fact, burn raisins, the point of which was to have fewer raisins, the result of which was to raise the price of raisins from $100 a pound to, or a bushel, to 400. That was thought to make the farmer better off, which it did. And it made the customers worse off. Then someone had a good idea and said it's sort of wasteful to burn raisins. Let's take the raisins we'd otherwise burn and give them to schoolchildren. And maybe we could even sell a few. And if we do, we'll get that extra money to the farmer, too. Now we have schoolchildren with raisins, we have the farmer having more money. Sounds like a pretty good program. Of course, you have taken some raisins. But what I don't see is how either the farmer or the schoolchildren are any of the worse off. And if they're no worse off, what compensation are these farmers entitled to? Of course, free riders could become yet better off. They could charge at the higher price that the program creates, $800. But after all, that isn't the issue because you have to have as a rule no free riders. And once you admit that as a rule, everyone, including perhaps these plaintiffs, are better off than none at all. Now, that's a very simple argument. It's what I understand to be the economics of the Brannon Plan, the FDR, the 1949, et cetera, and yet we've had endless cases, complexities, opinions, and fines. And therefore, I'm probably wrong with my simple argument. Of course, I doubt that I'm wrong. But nonetheless, I want you to explain what's wrong with it. We agree with much of what you said, except that it is not, I just reiterate, it is not a taking of the raisins. You want to say it's not a taking? Kneedler, it is a regulatory program classically analyzed under Penn Central because there is a reciprocity of advantage, one of the phrases this Court has frequently used, among producers. This does not distinctly affect the Petitioners. It applies to all producers. If Petitioners are correct, since 1949, every year there has been a reserve requirement, every producer has had a per se taking. Mr. Kneedler, I largely agree with what the Chief Justice said. I mean, just the way I think about this program is that this does seem a weird historical anomaly. Am I right that all the rest of these agricultural programs are done differently such that saying that this was a taking would not affect other agricultural programs? And also, are there any other programs out there, forget agricultural programs, but are there any other programs out there that we should be concerned about if we were to think about this as a taking? Well, with respect to agricultural programs, I think there are 8 or 10 other programs that have reserve provisions in them. I think most of those are not active in the sense that there is currently a reserve just like this one is not. And if this one has outlived its usefulness and the committee has not proposed a reserve requirement, the program is working exactly like it should. The committee which is responsible has decided not to impose a reserve requirement. I'm sorry, but you said that there were 8 or 10 other programs that you said they have? They have, like this one, provisions permitting the use of a reserve system, but like this one, they are not actively utilizing it. How long have they not been actively utilized? I think most of this has been in the last decade. I don't know precisely. But one of the things that's happened in this industry in the last 10 years is it has changed greatly. You will see from the amicus brief filed by Sunmate and the Raisin Bargaining Association, which I commend to your attention, they now believe that the reserve requirement should no longer be, or at least Sunmate does, should no longer be instituted. But they also firmly believe that Petitioners should not be permitted to be free riders on this program. They were able to sell the raisins. Kagan and Mr. Kneedler, what of non-agricultural programs? Are there other regulatory programs where the government says produce something that is characterizable as property? Well, I think the most immediately relevant one which this Court sustained was in the Monsanto case, where you were asking about records and information. That was a case in which as a condition for marketing pesticides, the manufacturer had to submit information to EPA. We know about that one. Anything else out there? I mean, tell me what the realm of regulatory programs is that we ought to be concerned about if we were to say something like the production of something, the production of stuff that somebody claims a property interest in is a taken. I'm not specifically aware of other programs, but Monsanto and the requirement to submit information to the government, for example, is widespread in our society. And what the Court basically said there was that if it was known when someone, before they entered commerce and applied their application, if they knew that the material would be disclosed to the public or used by the government for approving other applications, there was no taken. Scalia. I guess the government can prohibit the introduction of harmful pesticides into interstate commerce. I'm not sure it can prohibit the introduction of raisins. I mean, that's a, you know, dangerous raisins. I can understand imposing that condition on Monsanto, and that would not be an unconstitutional condition. Well, that seems to me it is when you impose it on raisins. Well, the Court's rationale in Monsanto was not based on the fact that it was that the product was dangerous, although that was obviously the setting. It was the fact that the manufacturer knew when submitting the information to EPA that it would be subject to disclosure, and therefore its property value either eliminated or appropriated by the government, as it were, for use in evaluating other applications. Well, but what you take from Monsanto, and look at your brief on page 32, and you cite Monsanto, you say that producers who are dissatisfied with the reserve regulations may plant different crops. That's a pretty audacious statement. If you don't like our regulations, do something else. Well, or that's not the only option that they had. They had the option of selling the grapes for other purposes. These, the primary. You mean wine? Wine or grape juice. These are, these grapes, the overwhelming majority of them, the Thompson seedless grapes, are, have a variety of uses, and that's one of the things that a grower would take into account, is would they be better off with raisins, right? But isn't what we say, if you don't like regulations, you can challenge them in court to see if they comply with the Constitution. The answer, I mean, if the answer is always you can do something else, it would seem we should, we'll never have these kinds of cases. No, but this is a substantive point I'm making, not a preclusion or review point. The substantive point is that there is market regulation. People who are growing crops in this industry know what the regulation is, and if they decide, and the Horns here have operated under this marketing order for 30 years before they challenge it. It seems to me what your argument is saying is, even if it's a taking, it's okay. It will be okay. Everything will work out. That's what I get from your argument. No, our argument, our fundamental argument is that it is not a taking to begin with because the grower voluntarily submits the total amount of its raisins to the handler. The handler then separates them into two quarters, one to be sold now and one to be sold later. But they both have to do with the timing and regulation of sale, which Petitioners acknowledge the government can regulate the timing and manner of sales. That's exactly what happens here. There are basically two markets. One is the free market. The other is the tightly regulated market for exports, for other outlets that do not compete with the domestic market. So if you don't like, we're going to say the Pledge of Allegiance in public schools and we're going to make everybody stand. And if you don't like it, go to a different school. I don't understand why that's not the same analysis here. We may be taking — you know, this may be a taking of your raisins or not, and if you don't like it, grow something else. Well, Monsanto is not the only case where that was. By the way, I do not believe that Nolan cut back on the rationale of Monsanto. What the footnote in Nolan said is we do not regard the ability to build on your property, your real property, to build a house as a governmental benefit. It did not say. In fact, I think it reaffirmed the idea that there was an exchange in Monsanto where the government was giving a benefit of clearing the product for use. Whereas you say that introducing raisins into interstate commerce is a government benefit, right? We think the regulatory program is a governmental benefit. No, not the regulatory. You're saying the activity which is subjected to this taking is the introduction of raisins into interstate commerce. And you say that is something that the benign government can give or withhold. It is the permission to do it, which is exactly what the Court said in Monsanto. But Monsanto is not the only case. Ye said the same thing with respect to real property. That was the case involving the mobile home park. And it was claimed there was a taking there because the mobile park owner was subject to rent control, and it was argued that that was just like Loreto because it was a forced physical occupation. And the Court said no. The critical distinction was that the Ye's had voluntarily chosen to enter the rental market, to enter into a commercial transaction, and the government could then, because Mr. McConnell was asked a number of questions about the Leonard case, but I take it that you don't think that the Leonard case has a very important bearing on this case, because you cited one time in your brief, it's a passing reference, on the issue of fungible goods. Am I correct there? We think it's a critical point. We are not we are not You don't think, you didn't propose, you didn't suggest to us that this case is just another version of Leonard and, therefore, we should affirm based on Leonard. To the extent Leonard was about tax, this was not, this program was not identified as a tax, partly because the raisins don't come to the government. The raisins go into a pool that belongs to all of the producers and then is divided up among the producers. This is not, these are not things that are appropriated for the government's own use. But we think Leonard is critically instructive for the point that with respect to property like this, like the oyster shells or like raisins, what the Court said is that they are fungible, their only value is for commercial sale. This is not like the ownership of real property in Loretto, which is unique and personally identified. These raisins are valuable only for sale and, in fact, as I said, this order kicks in only when the producer has committed the raisins to sale. So put all the regulatory aspects of the program aside for a moment and just say this were a much simpler program and it said the government says to the raisin industry, you know, we could tax you and say you have to deliver 2 percent of your net profits. We're not going to do that. We're just going to take 2 percent of your raisins. Would that be constitutional? Would that be a taken? That would be, I think, like Leonard. It would be an in-kind tax. I don't think there's anything that would prohibit that being done, but that's not — I mean, and we think the fact that that would be okay is instructive here, as the Court's discussion of Leonard suggests, but the Court doesn't have to get to that point. But you said you don't think of this case in that way, and why don't you? Well, it's analogous in the sense that Congress may well be able to do this in a different way. The reason I said it was different is that the oysters, the raisins, excuse me, are not being used for the government's program. They do not go to school lunch programs. If the government wants raisins, it buys them. It doesn't — it doesn't appropriate. We don't usually allow committees of producers who are called to government to impose taxes, do we? I mean, that's usually done by Congress. Or — And this essentially is done by some committee. Right. But it's a committee elected by producers. It's important to recognize — Well, so they can impose taxes, you're saying. This is just like a tax. What I was saying is that there are other — the government may well be able to impose something, some exaction as a tax, but this is a regulatory program adopted by producers. Again, it's important to recognize, and this goes back to the New Deal. This Court has had numerous cases involving these marketing orders. Whenever a majority of producers agree to, I have to be bound by? I mean, these people disagree. They do disagree, but the disagreement does not convert it into a taking. And if they believe the program is not operating correctly, then there are — Well, I'm not saying the disagreement converts it into taking. I'm just saying that it doesn't — it doesn't carry much water to say that this is a program adopted by producers. If 51 percent of the producers want to do it, there's 49 that don't want to do it. Well, I think it's a pretty good indication that the premises on which Congress enacted this statute in 1937 operated then and operate — operate now for the benefit of producers. And it shouldn't be necessary in any one particular year in which the regulatory program is in place to calibrate whether the benefits outweigh the burdens. Well, I think — Central planning was thought to work very well in 1937, and Russia tried it for a long time. Well, if — again, if this program is not working, it can be modified, and in fact, the committee comprised of producers has decided not to impose a reserve requirement in recent years. Roberts. You've made the point several times that the government sells these raisins for the benefit of the producers, right? Right. Well, what if the producers, some of them, think they can do a better job of selling them? They can get a better price, because they're better producers, they're better marketers, they have export contacts that others don't. But the — this is just standard regulation. What Congress has said is you — if you're going to sell, you have to sell in the manner set up under this program. And the portion that they — Well, but that's not usually what — when you're talking about that type of regulation. I understand that, you know, the raisins have to be so big or you can't call them raisins, and they've got to have safety inspections and all. But you've been presenting this as the reason this is a good program is because we sell the raisins and then we give some of what's left to the — to the producers. I don't think that's a very common approach to market regulation. Well, there — there are two pools of raisins, and how you — how you treat or how you implement the notion that there are two different pools of raisins may vary. But where you have that, the similarities are much more fundamental. You have the free-tonnage raisins, which are — which the grower is immediately paid for and the handler can immediately put on the market, but there was a judgment made when this — when this marketing order was established, and SunMaid and the Raisin Association believe it was still true during these years, that if you — if you have a big surplus, as there was around the turn of the century, it would make the prices plummet if those extra raisins were put on the — on the open market because the demand for raisins is inelastic. So what this marketing order does is it estimates where it operates, it estimates what the free-tonnage requirement will be, and that is completely open to the market. The reserve raisins, if you — they're — they're essentially valueless because you don't need them to satisfy the existing market. You take them off the market to prop up the prices of the — of the free-tonnage raisins, and then the committee will sell them when they will not undermine, or in a manner that will not undermine, the free-tonnage. Alito, suppose the same sort of program were carried out with respect to real property. Would you — would you provide the same answer? Suppose that property owners, owners of real property in a particular area, think that the value of their property would be increased if they all surrendered a certain amount of that property to the government for the purpose of producing a — creating a park or for some other reason. And so they — they get the municipality to — to set up this program, and one of them objects to surrendering this part of that person — of his or her land. Would — would that not be a taking? I think real property would be fundamentally different. Well, why would it be — I thought you said you're not arguing that there's a difference between real property and personal property. We're not saying there's a categorical difference, but I think — I think the Lucas decision is very instructive there, that when — when the Court was talking about the ability to regulate real property, it said that there's a big difference between real property and personal property, at least personal property being used for commercial purposes, which might even be rendered valueless by virtue of governmental regulation. So we — Mr. Kneedler, what's the statute of limitations on a takings claim? Six years, I think it would be. Has there been any reserves created in the last six years? I think the last one was 2009, 2010. I wanted to correct one fact. Explain to me why — why the market for raisins is inelastic. You mean people won't buy more raisins if they're cheaper? That's basically correct. It's just a — it's just a quality — it's just a quality of raisins. And there's a limited set of outlets. Raisins now are primarily used as — as food ingredients in Raisin Bran and — and things like that. And the price — the price doesn't affect demand. And — and therefore, if you put a great surplus on the domestic market, the prices — prices will crater. And so this has a very sensible approach. Mr. Kneedler, you don't have to convince us that this is a sensible program for you to prevail, do you? No. We do not. The question is — We could think that this is a ridiculous program. Isn't that right? Pardon? I'm sorry. We could think that this is a ridiculous program. You could think this is a ridiculous program, but it is one that has been around since 1949. And Petitioner's argument, again, means that every grower since 1949 has had a per se takings. Mr. Kneedler, I'd like to — It doesn't help your case that it's ridiculous, though. You — you acknowledge that. It is not — it is not, let me be clear, a ridiculous program. But this is a serious point, actually, because the ridiculousness or sensibleness of a program is really not for us to decide. Yes, I — I agree with that completely. I mean, that is our — this is a regulatory program and should be thought of under this Court's regulatory jurisprudence. Ms. Kneedler, you asked this before, but your answer wasn't clear. Markeling orders of this sort that have a reserve pool, you said there were eight or ten of them. Have any others been operative, as this one has been? They have been operative in the past. Most of them are not operative. Operative in the sense that the reserve — this is my understanding that the reserve provision has been triggered. Those is the government selling the reserve. I think it's — I think it's true of maybe several others. I'm not — I'm not sure. Some of them have to do with the handler, the difference between the handler and producer. I wanted to correct — I'm not just — oh, go ahead. I wanted to correct a factual error in the computation. So there was a suggestion in the one year there was $810 was the field price, and because of the mathematical calculations, the claim was the Petitioners would have been better off without the reserve. That's not correct. The mistake there is the assumption that all the raisins would have been sold at the field price if they were all put on the market, and that's — that's just inconsistent with the premise of the order, that the only reason that there is a high field price for the free-tonnage raisins is that the other ones are taken off the market. So they would not have — they would not have been recovered in that way. How many — how many of these programs are there of marketing orders? I think there are scores of them, actually. I mean, I'm trying to put the 8 to 10 in relation to how many. I don't know the total number, but I — we can follow that up with a supplemental letter. I think — I think there are scores of them. But this is not fundamentally different from the others. And again, the government is not acquiring these raisins for itself. The government doesn't actually keep them in its possession. It just tells the handler to keep them and sell them later rather than selling them now, and that is not an appropriation of private property. Roberts. Thank you, counsel. Mr. McConnell, you have 5 minutes remaining. Thank you, Mr. Chief Justice. So several things have been cleared up. The government now does concede that the government takes legal title to the raisins. The government does abjure an argument based on facts. It happens with trustees all the time. To the extent that we've eschewed taking formal titles as meaningful with respect to actual control or actual benefit, we — trustees take title and — but it's not for their benefit. It's for the benefit of their beneficiary. That's true, Justice Sotomayor, but the taking — the government is not a trustee here. And the — Oh, but in a form, yes. It's directed to sell the reserve raisins at the best price it can get given the limitations on the free market. It sells for the best price, and then it uses the proceeds for its own regulatory purpose. You have only 4 minutes in rebuttal. You had some other points? Just as to the factual point, it is not — our calculations are not based upon selling all of the raisins at the field price. Our calculations are based upon being able to sell all the raisins at the price that the Secretary has said would be the price in an unregulated market, which is $747 per ton. And that is — it is certainly not true that these reserve raisins are valueless. They are an extremely valuable commodity, and in most of the years, the producers of the raisins receive absolutely nothing for them. The important point here, though, is that — is that it is not any less of a taking, even if there is a benefit. I have no doubt, for example, that in Loretto, that the value of the apartment went up because there was a cable, because it became cable-ready for its — for its tenants. That did not make it any less of a taking, as this is a per se taking, and any benefits only go to whether there might be some kind of implicit in-kind compensation as a result of the benefit. And if this were an imminent domain proceeding, I think that that might well be relevant. This is, in fact, only an administrative enforcement action in which the question is whether the Department of Agriculture was entitled under the Constitution to demand either the raisins or their monetary equivalent without any payment of — of compensation. Breyer, that last. Why isn't it for them to make that argument? They do the argument, you know, that you're better off, et cetera. If you would look at the — Is they waive it? I mean, what's the issue? No, it's the regulation. I'm sorry. If you look at 7 CFR 989.166C, you will see that that is the provision for what happens when the handler does not turn over reserve raisins to the Department of Agriculture. It is — it has very specific provisions for what happens, and there is no provision in that for implicit in-kind compensation. But just — can they argue that the fact that all the raisin producers are better off because of this program, including you, but no free riders, that's what's the compensation? Can they at least argue that, or have they conceded that? Under this regulation, I do not think it is open to the Department of Agriculture to argue that. I think that that would be a logical argument if this were an imminent domain proceeding and we were simply trying to figure out what the proper value of the raisins is, reserving, of course, the point that we believe that this program does not benefit the producers. We believe that the — we believe that this program actually makes the producers demonstrably worse off. The only people who benefit from this program are the recipients of the subsidy — of the export subsidies. The exporters. That's right. Mr. McConnell, if I take you back to the very first thing that you said in this argument, because you said typically the handler doesn't take the product and the handler doesn't pay for the product, and you would think that the horns here would only have a takings claim, assuming that they do have a takings claim, for the raisins that they produced and not for the raisins that other people produced. But you said that that's not correct in this case? It is not, because they pay the — a check went out from the Raisin Marketing Association to the producers for every raisin, not just the free-tonnage raisins, but for the reserve-tonnage raisins as well. So the horns are actually the — the only people with a financial interest in the raisins in this case. That is unusual. Mr. McConnell, this is probably neither here nor there, but what is the impact of the drought been on the raisin producers? Do you know? It is not good. It's a very carefully guarded response. Thank you, Atlanta. And I wonder if I'll be able to take a shower when I go home. Thank you, Counsel. The case is submitted.